# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 Proceeding |
| DAVID K. CROWE and COLLEEN M. CROWE, | Case No. 4:19-bk-04406-BMW |
| Debtors. | |
| TURBINE POWERED TECHNOLOGY, LLC, | Adversary Case No. 4:19-ap-00260-BMW |
| Plaintiff, | **RULING AND ORDER RE: DEBTORS'/DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (COUNTS I-III)** |
| v. | |
| DAVID K. CROWE and COLLEEN M. CROWE, | |
| Defendants. | |

This matter is before the Court pursuant to the *Motion for Partial Summary Judgment (Counts I – III)* (the "MPSJ") (Dkt. 18)[1] and the *Defendants' Separate Statement of Facts in Support of Motion for Partial Summary Judgment (Counts I – III)* (the "SOF") (Dkt. 19) filed by the Debtors/Defendants, David K. Crowe and Colleen M. Crowe (collectively, the "Crowes," and when referring to David K. Crowe, "Crowe"), on November 13, 2019; the *Response to Motion for Partial Summary Judgment (Counts I-III)* (the "Response") (Dkt. 30) and

---

[1] Unless otherwise stated, all references to the docket are references to the docket in this adversary proceeding.

*Controverting Statement of Facts in Support of Response to Motion for Partial Summary Judgment (Counts I-III)* (the "CSOF") (Dkt. 31) filed by the Plaintiff, Turbine Powered Technology, LLC ("TPT"), on December 20, 2019; the *Reply to Motion for Partial Summary Judgment (Counts I – III) and Motion to Strike* (the "Reply & Motion to Strike") (Dkt. 37) filed by the Crowes on January 10, 2020; and all filings in the record related thereto that the Court has decided, in its discretion, to consider pursuant to Federal Rule of Civil Procedure 56(c)(3), as incorporated by Federal Rule of Bankruptcy Procedure 7056.

The Court held oral arguments on the MPSJ on June 23, 2020, at the conclusion of which the Court took this matter under advisement.[2]

The Court now issues its ruling.

## I. Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I), 157(b)(2)(J), and 1334. The Crowes have consented to this Court's jurisdiction to enter final orders and judgments. When TPT filed its proof of claim, it voluntarily submitted itself to the jurisdiction of the Court. *See Langenkamp v. Culp*, 498 U.S. 42, 44, 111 S. Ct. 330, 331, 112 L. Ed. 2d 343 (1990); *see also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58-59 and n.14, 109 S. Ct. 2782, 2799-2800 and n.14, 106 L. Ed. 2d 26 (1989). TPT has conceded that it has submitted to this Court's jurisdiction. (1/22/2020 Hearing Tr. 25:11-19).

## II. Factual Background & Procedural Posture

### A. Pre-Petition Background & Litigation

Pre-petition, Tucson Embedded Systems, Inc. ("TES"), Advanced Turbine Services, LLC ("ATS"), and TPT engaged in business dealings pertaining to a turbine engine control system called the Industrial Digital Engine Controller ("iDEC"). (SOF at ¶ 2; *see* CSOF at ¶¶ 2, 55). From approximately 1997 until approximately 2015, Crowe was the CEO of and had an ownership interest in TES. (*See* SOF at ¶ 4; CSOF at ¶ 4; *see also* SOF at ¶ 13; CSOF at ¶ 13; SOF at Ex. C). He was also a software engineer who worked on the development of the iDEC.

---
[2] At the conclusion of the June 23, 2020 hearing, the Court also authorized counsel for TPT to supplement the record with full versions of cited transcripts. TPT supplemented the record with these transcripts on June 25, 2020. (*See* Dkt. 130).

(SOF at ¶ 4; *see also* CSOF at ¶ 4). Crowe and the other principals of TES also had ownership interests in Arizona Turbine Technology, Inc. ("ATT"). (*See* SOF at ¶ 13; CSOF at ¶ 13; SOF at Ex. C).

The Crowes assert that TES developed the iDEC independently of TPT. (SOF at ¶ 5). TPT asserts that it and TES jointly developed certain iDEC controls technology pursuant to a vendor agreement with ATS. (CSOF at ¶ 5). These iDECs were installed into turbine hydraulic fracturing units. (SOF at ¶ 6; CSOF at ¶ 6). Crowe marketed the iDEC through ATT, although the parties dispute whether he did so in the course and scope of his employment. (*See* SOF at ¶ 12; CSOF at ¶ 12).

### 1. TES v. TPT Litigation

In February 2014, TES commenced a lawsuit against TPT for alleged unpaid invoices (the "TES v. TPT Litigation"). (*See* SOF at ¶ 7; CSOF at ¶ 7). TPT asserted a counterclaim for misappropriation of trade secrets. (SOF, Ex. J at 13-14).

TPT described its trade secrets as including:

> (a) . . . the use of the T-53 as a driver for a power generator, including obtaining access to the Turbine Power's dyno, equipment, manufacturing and development facilities and Turbine Power's engineers and technicians[;] and
>
> (b) . . . the timing temperatures, flow rates, horsepower settings, and pressures at which the T-53 optimally operated . . . .

(SOF, Ex. I at 3-4; *see* SOF at ¶¶ 8-9; CSOF at ¶¶ 8-9).

TES filed a motion for partial summary judgment with respect to TPT's trade secrets claim, and in March 2016, the district court granted the motion for partial summary judgment on the basis that TPT had "failed to provide enough detail about the alleged trade secrets for TES or th[e] Court to adequately discern what might be legally protectable." (SOF, Ex. I at 18-19; *see* SOF at ¶¶ 10, 34; CSOF at ¶¶ 10, 34). However, no party has contended that the district court's summary judgment order is a final order.

In or about July 2016, TPT filed a motion to compel and for sanctions in the TES v. TPT Litigation, in which TPT alleged that TES had failed to comply with an order of the court

requiring TES to produce certain variations, including the final version, of the subject software source code, and in which TPT asked the court to reopen the briefing on TES' motion for partial summary judgment. (*See* 6/23/2020 Hearing Tr. 44:17-21).[3]

The district court judge heard oral argument on TPT's motion to compel, but in October 2016, before the court issued a ruling, TES and TPT settled the TES v. TPT Litigation. In the *Settlement Agreement and Release* (the "Settlement Agreement") (SOF at Ex. A), TES and TPT agreed that "TES owns the hardware and software platform for the iDEC[,]" and that TPT and TES jointly own right, title, and interest in and to U.S. Patent No. 9,429,078 (the "Patent"). (SOF, Ex. A at ¶ 1; *see* SOF at ¶ 20-21; CSOF at ¶ 20-21).

The Settlement Agreement further provides that "TPT owns the intellectual property with regard to tuning the iDEC developed for the specific purpose of controlling industrialized turbine engines for use in the oil and gas industry[,]" which intellectual property "includes gas turbine engine operating and protective parameters provided to TES that w[ere] necessary to run the subject engines in industrial applications." (SOF, Ex. A at ¶ 1).

TES also represented that it had "not assigned or transferred any of its or TPT's technology which forms the subject matter of [the Patent] to . . . David Crowe or any other affiliated person or entity" and that "[a]ny taking, use, misappropriation, and transfer of TES and TPT's technology by David Crowe . . . or any other affiliated person or entity was not authorized by TES or TPT and would have been outside the scope of David Crowe's employment by TES." (SOF, Ex. A at ¶ 2; *see* SOF at ¶ 22; CSOF at ¶ 22).

Pursuant to the Settlement Agreement, "TES underst[ood] that TPT [would] pursue its claims and the return of its intellectual property from Crowe . . . and any other complicit parties . . . ." (SOF, Ex. A at ¶ 6).

The Settlement Agreement includes a release; however, the release expressly excludes "any claim or potential claim asserted against David Crowe and/or his affiliates based on conduct undertaken on behalf of any person or entity other than TES or not within the course and scope

---

[3] The Court will also take judicial notice of the docket in the TES v. TPT case, case number 4:14-cv-01868-BGM.

of Crowe's office or employment with TES." (SOF, Ex. A at ¶¶ 10a & 10b).

TES acknowledges that TPT has trade secrets that are "incorporated into certain modules of the iDec control's source code, developed in connection with the adaption of the iDec for turbine engines to power hydraulic fracturing and pumping equipment applications[,]" which adaptation was "developed in a joint project undertaken by TES with . . . TPT." (Dkt. 107 at 3-4).

### 2. Crowe v. TES Litigation

While the TES v. TPT Litigation was pending, disputes arose between Crowe, TES and other principals of TES. These disputes were resolved in July 2016, when TES, Crowe, related entities, and other third parties entered into a *Purchase Term Sheet* (the "Purchase Term Sheet") (SOF at Ex. C). In accordance with the Purchase Term Sheet, Crowe gave up his interest in TES in exchange for the other principals of TES giving up their interest in ATT. (*See* SOF at ¶ 13; CSOF at ¶ 13).

Sometime in 2017, the Crowes and various of their entities commenced additional litigation against TES and its principals, which litigation was referred to arbitration and which litigation remained pending as of the Petition Date. (*See* Admin. Dkt. 55).[4]

### 3. Udall Litigation

In February 2017, the Udall Law Firm, LLP ("Udall"), which represented TPT in the TES v. TPT Litigation, filed a lawsuit against TPT alleging breach of contract and unjust enrichment claims (the "Udall Litigation"). (SOF at Ex. M; *see also* SOF at ¶ 25; CSOF at ¶ 25). In the context of the Udall Litigation, TPT asserted a claim against Udall for legal malpractice, alleging that Udall had committed malpractice by failing to compel production of certain source codes in order to procure evidence of TPT's trade secrets. (SOF at ¶ 26; CSOF at ¶ 26).

After TPT presented its evidence at trial, Udall moved for a directed verdict on the malpractice claim, arguing that TPT had failed to present any evidence of what trade secrets were contained in the source code or any evidence that TPT had obtained the missing source code with

---

[4] References to "Admin. Dkt." are references to the administrative docket in the Crowes' bankruptcy case, case number 4:19-bk-04406-BMW.

its embedded proprietary information. (SOF, Ex. F at 007636).

The state court granted Udall's motion for a directed verdict on the basis that TPT had failed to adequately specify its alleged trade secret. (*See* SOF at Ex. G; *see also* SOF at ¶ 29; CSOF at ¶ 29). As summarized by the court, Ted McIntrye ("McIntyre"), the President of TPT, described the trade secret as "something other than publicly available settings for T-53 engines and aircraft applications," and as "consist[ing] of essentially the compilation comprised of the parameters and settings, such which include timing, temperatures, flow rates, horsepower settings, pressures, warning protocols and shut down protocols, all which are necessary to successfully utilize a T-53 engine which has been transformed to run in the field on natural gas in order to drive a one megawatt generator in oil and gas applications in remote locations where staff and personnel cannot be constantly on site in order to monitor to avert catastrophic failures." (SOF, Ex. G at 2).

In the ruling, the state court judge specifically referred to the deposition transcript of Eldon Crom ("Crom"), in which the witness noted the importance of the source code. (SOF, Ex. G at 2). Specifically, Crom noted that the process did not work without the "interface chunks" provided by TPT. The court noted that these source codes, which Crom referred to as the "wire and glue," were never disclosed, pursuant to a protective order, or offered into evidence in the case. (SOF, Ex. G at 2-3).

The court stated that it "d[id] not believe that anyone question[ed] whether [TPT] possess[ed] a trade secret." (SOF, Ex. G at 6). The question was whether or not the trade secret was available for the jury in the case to ascertain the nature of what TPT was seeking to protect, and on the record before it, the court determined that TPT had not done enough to define its trade secret to allow the matter to go to a jury. (SOF, Ex. G at 6).

### 4. Louisiana State Court Case

In 2016, TPT filed a lawsuit in Louisiana against TES, ATT, Crowe, and third parties (the "Louisiana State Court Case"), which remains pending, but has been stayed as to Crowe.[5] (SOF

---

[5] TPT filed a motion for stay relief, which motion remains pending before the Court. (*See* Admin. Dkt. 144).

at ¶ 14; SOF at Ex. K).

TPT has acknowledged that the trade secret claims at issue in this adversary proceeding are the same as the trade secret claims at issue in the Louisiana State Court Case. (6/23/2020 Hearing Tr. 62:23-63:4).

### B. Post-Petition Events

On April 12, 2019 (the "Petition Date"), the Crowes filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

On July 16, 2019, TPT filed a proof of claim asserting a claim in an amount "[n]ot less than $30,014,536.82" (the "TPT Claim"). (Admin. Dkt. Proof of Claim 12-1). The Crowes have objected to the TPT Claim in its entirety and the TPT Claim remains contingent, unliquidated, and disputed. (*See* Admin. Dkt. 176).

On July 22, 2019, TPT filed the *Complaint* (the "Complaint") (Dkt. 1) against the Crowes that commenced this adversary proceeding. The Complaint alleges that the TPT Claim is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), 523(a)(6), and 727(a)(4).

TPT's §§ 523(a)(4) and (a)(6) claims are based upon Crowe's alleged theft, misappropriation, and/or commercialization of "TPT's Invention" and/or "the Invention." "The Invention" is defined in the Complaint as "turbine-powered equipment for hydraulic fracturing and power generation" that was developed by McIntyre. (Dkt. 1 at ¶ 12). TPT's § 523(a)(2)(A) claim is based upon Crowe's alleged representations and misappropriations of "TPT's technology[,]" and/or "the digital engine controls technology for turbine-powered hydraulic fracturing and power generation equipment which TPT had in fact developed."

On August 14, 2019, the Crowes filed their *Amended Disclosure Statement in Support of Amended Chapter 11 Plan of Reorganization Dated August 14, 2019 Proposed by David K. Crowe and Colleen M. Crowe* (the "Amended Disclosure Statement") (Admin. Dkt. 134), which was subsequently approved by the Court. (Admin. Dkt. 140). In the Amended Disclosure Statement, the Crowes assert the following:

- "Crowe is a control engineer in the business of designing, installing, and fine-tuning control systems for turbine engines used for aviation, and other

- industrial applications, including oil and gas production by hydraulic fracturing." (Admin. Dkt. 134 at 7).[6]
- Crowe is the owner and CEO of CE-Systems, Inc. ("CE-Systems") and Crowe began working for EnerTech-AI Texas, LLC ("EnerTech-AI") post-petition. (Admin. Dkt. 134 at 7, 9). CE-Systems holds a 40% ownership interest in EnerTech-AI. (Admin. Dkt. 134 at 17). In exchange for the 40% interest in EnerTech-AI, CE-Systems "transferred certain technology," to EnerTech-AI, which technology is described as "certain cloud-based software developed after [the court in the Louisiana State Court Case issued an injunction] that monitors the performance of certain fracturing pumps[,] [s]pecifically . . . cloud based applications that analyze data; window based applications including 'Pumpdown,' 'MultiPumpMgr' and 'Data Scope'; Aviation ATDEC FADEC; 'CloudGateway'; 'DataCon'; Conventional Pump Control software and hardware designs that match the 10 Ecostim Conventional PumpDown Pumps and Industrial Generator packages[,]" and which the Crowes maintain are "standard in the industry and contain no proprietary information[.]" (Admin. Dkt. 134 at 7, 9, 17).
- "Crowe's employment at EnerTech-AI depends in part on his ability to devise and deploy digital controls use in turbine-powered hydraulic fracturing in oil and gas production." (Admin. Dkt. 134 at 9).
- "Any and all information, practices, or technology claimed by [TPT] in its suit against the [Crowes] remained in CE-Systems and/or [ATT], and was completely segregated from the future business of EnerTech-AI." (Admin. Dkt. 134 at 17).
- "EnerTech-AI has not and will not use any technology owned by any of the Defendants in the [Louisiana State Court Case]." (Admin. Dkt. 134 at

---

[6] Pincites to the Amended Disclosure Statement are based on the official docket page numbers, not the page numbers on the underlying document.

18).

- "EnerTech-AI will use digital control systems for T53, TF40, or T-55 engines, but these are not the intellectual property of any other party including any of the other Louisiana Defendants and [TPT] and/or Green Field Energy Services, Inc." (Admin. Dkt. 134 at 19).
- "CE-Systems also owns a Turbine Pump Controller for use in hydraulic fracing operation subject to a license with [ATT] and an iTpc Turbine Controller for use in hydraulic fracing operation subject to a license with [ATT]. These two assets contain information that is subject to the pending litigation in Louisiana and were excluded from the transfer to EnerTech-AI." (Admin. Dkt. 134 at 20).
- "The assets of EnerTech-AI include trailer mounted turbine-driven high-pressure pumps for use in hydraulic fracturing for oil and gas operations. . . . [TPT] claims these systems as its exclusive trade secrets in the lawsuits described above." (Admin. Dkt. 134 at 20).

On August 21, 2019, the Crowes filed their *Answer to Complaint* (the "Answer") (Dkt. 2) in this adversary action, in which the Crowes generally deny the allegations raised in the Complaint.

On September 23, 2019, during a deposition conducted by the Official Committee of Unsecured Creditors, Crowe testified that (collectively, the "Crowe Deposition Testimony"):

- "To be honest with you, I do not know what's at litigation between TPT and me. TPT has yet to define their trade secrets. In the Udall [Litigation], it was exposed what TPT trade secrets are with the TES/TPT agreement, which is publicly available, for which I am not using." (Dkt. 10, Ex. D at 42:17-21).[7]

---

[7] References to deposition transcripts are by deposition page and line number. For example, 50:11 would refer to page 50, line 11 of the cited deposition transcript.

- "I've had to painfully redevelop, a third time, the technology. That started in 2018 when we filed the patent for the ATDEC. That's prior to us knowing what the actual trade secret was by TPT, which luckily we know because of the Udall case." (Dkt. 10, Ex. D at 46:17-21).

On October 24, 2019, the Court opened discovery in the adversary action to both sides. (10/24/2019 Hearing Tr. 49:19-50:8). At this point no discovery deadline has been set.

On October 29, 2019, TPT asserts that it recovered the complete, final version of the source code developed by TES and TPT. (Dkt. 30 at 5; 6/23/2020 Hearing Tr. 48:6-8).

On November 13, 2019, the Crowes filed the MPSJ and SOF. In the MPSJ, the Crowes ask the Court to grant summary judgment in their favor with respect to TPT's §§ 523(a)(2)(A), (a)(4), and (a)(6) claims on the basis that TPT has failed to describe its alleged trade secret(s) with sufficient particularity, and has therefore failed to set forth a prima facie case.

On December 20, 2019, TPT filed the Response and the CSOF. In the Response, TPT asks the Court to deny the MPSJ on the basis that there are numerous genuine disputes of material fact. Specifically, TPT asserts that there are disputed issues of material fact as to "TPT's ownership of certain proprietary technology and the existence of TPT's trade secret."

On January 10, 2020, the Crowes filed the Reply & Motion to Strike, in which they: (1) contend that TPT's Response and CSOF do not set forth any contested facts or issues of law that would prevent the Court from granting the MPSJ; (2) argue that the doctrine of issue preclusion requires TPT to present a definition of its trade secret that is distinct from that presented to the court in the TES v. TPT Litigation; (3) address various of the statements set forth in the CSOF; and (4) ask the Court to strike the twelve additional statements added to the end of the CSOF on the basis that they are immaterial to the matter before the Court.[8]

On March 9, 2020, without leave of the Court, TPT filed an *Amended and Supplemental Response to Motion for Partial Summary Judgment* (the "Amended Response") (Dkt. 64) and an *Amended Controverting Statement of Facts in Support of Response to Motion for Partial*

---

[8] The Crowes have not pursued the motion to strike component of the Reply & Motion to Strike, and in any event, the Court does not find any of the statements of fact that the Crowes have asked the Court to strike to be relevant for purposes of this ruling.

*Summary Judgment (Counts I-III)* (the "Amended Controverting SOF," and together with the Amended Response, the "Amendments") (Dkt. 65).

On March 10, 2020, TPT filed a *Declaration of Ted McIntyre in Support of Motion to File Under Seal and in Support of Response to Motion for Partial Summary Judgment* (the "McIntyre Declaration") (Dkt. 67). The McIntyre Declaration refers to 100 exhibits, all but one of which have been provisionally filed under seal pending the Court's ruling on a motion to file under seal, and are therefore, at this time, not part of the record. (Dkts. 67, 68, 69, 70, 71, 72 and 73).

On April 10, 2020, TPT filed a *Motion to File Expert Report Under Seal* (Dkt. 98), the *Expert Report of Steven B. Kushnick, P.E.* (the "Expert Report") (Dkt. 100), which has been provisionally sealed, and a *Motion for Leave of Court to: (1) Amend Response to Motion for Partial Summary Judgment; (2) Amend Controverting Statement of Facts in Support of Amended Response to Motion for Partial Summary Judgment; (3) Supplement Record; and (4) Allow Expert Report* (the "Motion for Leave") (Dkt. 97).

On May 6, 2020, the Court denied the Motion for Leave. (Dkt. 108).

On May 15, 2020, TPT sought reconsideration of the Court's *Ruling and Order Re: Motion for Leave [Dkt. 97]*, which request for reconsideration the Court denied. (Dkt. 113). As a result, the Court will not consider the Amendments or the Expert Report for purposes of this ruling.[9]

On June 23, 2020, the Court held oral arguments on the MPSJ.

During oral arguments, counsel for TPT represented to the Court that TPT's alleged trade secrets are "the interface information for [T-40, T-53, and T-55] engines," also referred to as "interface chunks," which were inserted into the source code by TES during the joint project between TES and TPT. (6/23/2020 Hearing Tr. 41:4-15; *see also* 6/23/2020 Hearing Tr. 45:6-8). TPT has represented that it intends to bring the relevant source code before the Court through the

---

[9] That being said, the motion to file the Expert Report under seal remains pending and has not been ruled upon by the Court. TPT's *Amended Motion to File Confidential Information and Documents Under Seal* (Dkt. 33), as supplemented, likewise remains pending and has not been ruled upon by the Court. The motions to file under seal have been contested by the Crowes and certain of the documents at issue have not yet been provided to the Crowes pending the outcome of litigation pertaining to a protective order. TES has also asserted concerns regarding these motions.

Expert Report. (6/23/2020 Hearing Tr. 60:8-22).

It is TPT's position that Crowe is the person who inserted the interface chunks into the source code, and therefore, he knows what the interface chunks – i.e. the trade secrets – are. TPT points to the Answer as indicative of Crowe's knowledge of the alleged trade secrets, and notes that at no time did the Crowes file a motion to dismiss or a motion for a more definite statement.

Counsel for TPT also directed the Court to the following areas of the record, which TPT asserts sufficiently describe its alleged trade secrets: (A) the Complaint, and specifically paragraphs 43-49 thereof; (B) pages 21-32, 38-39, 54-56, 61-62, 71-74, 76-77, 90-93, 114, 116-117, and 128-132 of the deposition of Crom from the TES v. TPT Litigation (the "Crom Testimony"); (C) the Crowe Deposition Testimony and other excerpts from the deposition transcript; (D) pages 20, 21, 24-26, 28-29, 32-34, 41, 43, 47-48, 68, 97-98, and 123-128 of a transcript of a deposition of McIntyre conducted during the course of the TES v. TPT Litigation (the "McIntyre Deposition Testimony"); and (E) pages 191-199, 201, 205-211, and 212-214 of a transcript of a hearing conducted in the Louisiana State Court Case that contains testimony of McIntyre (the "McIntyre Hearing Testimony"). (6/23/2020 Hearing Tr. 53:4-55:15, 56:20-23, 57:8-58:11).

The Complaint describes TPT's alleged trade secrets as follows:

- "[S]pecialized turbine powered equipment and controls for non-aerospace applications, particularly for pressure pumping equipment for use in the oil and gas industry." (Dkt. 1 at ¶ 13).
- "[T]esting results and non-public technology" that were incorporated into "digital electronic controls for TPT's equipment." (Dkt. 1 at ¶ 16.b).
- "[T]urbine-powered pumping and power generation equipment[.]" (Dkt. 1 at ¶ 16.d).
- "[T]he source code and object code for the new digital electronic controls." (Dkt. 1 at ¶ 16.d).
- Gas turbine engines redesigned and converted from using liquid aircraft fuels to using gaseous fuel and fuel systems. (DE 1 at ¶ 16.e).

- The "Invention," defined as "turbine-powered equipment for hydraulic fracturing and power generation". (*See, e.g.* Dkt. 1 at ¶¶ 12, 16.s, 45-49).
- "[D]igital electronic controls technology" and/or "technology for digital controls for turbine powered hydraulic fracturing and/or power generation equipment." (Dkt. 1 at ¶¶ 16.q & 16.r).
- "[D]igital engine control modifications, source code, object code, control values for industrial and new fuel capabilities, and software upgrades[.]" (Dkt. 1 at ¶ 16.v).
- "[P]roprietary industrialized gas-turbine controls data, test results, dual-fuel conversion technology, and other technology[.]" (Dkt. 1 at ¶ 43).

According to the Crom Testimony, TES, TPT, and others worked on a project involving TF40, T55, and T53 engines, and Crowe was one of the software engineers from TES who traveled to the facility where engines were being assembled in Louisiana. (Dkt. 130, Ex. 1 at 61:7-62:4). The Crom Testimony describes the "interface chunk" as being a crucial 2-4% of the software source code without which the engines would not be able to operate correctly. (Dkt. 130, Ex. 1 at 91:2-13, 131:14-132:21).

As discussed above, in the Crowe Deposition Testimony, Crowe acknowledged that he was aware of certain of the trade secrets asserted by TPT, although Crowe asserted that he was not using such trade secrets. (*See* Dkt. 10, Ex. D at 42:12-21, 46:14-21).

The McIntyre Deposition Testimony suggests that TPT asserts it invented a product and/or protocol that could call for a complete hard shutdown of an engine upon a loss of oil pressure, and that Crowe worked on the product and/or protocol. (*See* Dkt. 130, Ex. 2 at 34:5-12, 43:15-25).

According to the McIntyre Hearing Testimony, the intellectual property TPT asserts Crowe has misappropriated is "controlling a turbine engine for hydraulic fracturing power generation," and "the digital entry controls and/or packages for turbine powered hydraulic fracturing equipment[,]" including the speed of the output turbine, the dry shaft speed, the cruise

control, and the embedded software and IP relating to set points, control, shutdown, bleed-band, closure, opening, and bleed valve. (*See* Dkt. 130, Ex. 3 at 192:7-12, 194:9-31, 196:6-197:7, 198:7-18, 201:13-19, 210:24-31).

During oral argument, the Crowes maintained their position that TPT has not sufficiently described its alleged trade secret(s).[10]

## III. Legal Analysis & Conclusions of Law

The narrow issue before the Court is whether TPT has defined its alleged trade secret(s) with sufficient particularity to allow the Crowes and the Court to discern what might be legally protectable, and thus survive summary judgment.

### A. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, as incorporated by Federal Rule of Bankruptcy Procedure 7056, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"[I]f the non-moving party bears the burden of proof at trial, the moving party's summary judgment motion need only highlight the absence of evidence supporting the non-moving party's claims." *Firetrace USA, LLC v. Jesclard*, 800 F. Supp. 2d 1042, 1046 (D. Ariz. 2010). "The burden then shifts to the non-moving party who must produce evidence sustaining a genuine issue of disputed material fact." *Id.*

Pursuant to Federal Rule of Civil Procedure 56(c)(1):

> A party asserting that a fact cannot be or is genuinely disputed must

---

[10] Counsel for the Crowes also argued that TPT's claims fail as a matter of law because TPT has failed to show that what TPT has defined as its trade secret(s): (1) were owned by TPT; (2) were not publicly available; and (3) were the subject of reasonable efforts to maintain its/their secrecy. These arguments go beyond the scope of the MPSJ. As such, the Court will not consider them for purposes of this ruling.

support that assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

However, "at the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.

When determining whether to grant or deny a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The Federal Rules of Bankruptcy Procedure instruct courts to construe, administer, and employ this rule in a way that "secure[s] the just, speedy, and inexpensive determination" of cases and proceedings. Fed. R. Bankr. P. 1001.

**B.     Trade Secret Claims**

Arizona and Louisiana have both adopted the Uniform Trade Secrets Act, and the parties agree that the definitions of "trade secret" adopted by Arizona and Louisiana are virtually identical. (6/23/2020 Hearing Tr. 19:12-15, 62:6-12). Given the absence of a conflict between the respective states' laws, the Court need not determine which state's definition of "trade secret" applies. *See Reteria v. Ramanlal*, No. CV-07-00658-PHX-ROS, 2009 WL 73675, at *8 (D. Ariz. Jan. 9, 2009).

Under both Louisiana and Arizona law, "trade secret" means: "information, including a formula, pattern, compilation, program, device, method, technique, or process" that does the

following: (1) "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use;" and (2) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ariz. Rev. Stat. Ann. § 44-401(4); La. Stat. Ann. § 51:1431.

The party asserting a misappropriation of trade secrets claim "must identify the trade secrets and carry the burden of showing that they exist." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998) (quoting *MAI Sys. Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 522 (9th Cir. 1993)). "When a party fails to identify its trade secrets with particularity, summary judgment is appropriate." *W.L. Gore & Assocs., Inc. v. GI Dynamics, Inc.*, 872 F. Supp. 2d 883, 899 (D. Ariz. 2012) (citing *Imax*, 152 F.3d at 1166).

In order for a plaintiff to meet its burden of establishing a trade secrets claim, "[t]he plaintiff 'should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.'" *Imax*, 152 F.3d at 1164-65 (quoting *Universal Analytics v. MacNeal-Schwendler Corp.*, 707 F. Supp. 1170, 1177 (C.D. Cal. 1989)).

Whether a trade secret has been described with sufficient particularity necessarily depends on the facts of the case. *See id.*, 152 F.3d at 1166-67. For example, in *Forro Precision, Inc. v. International Business Machines Corp.*, 673 F.2d 1045, 1056-57 (9th Cir. 1982), the Ninth Circuit found the plaintiff's reference to "dimensions and tolerances" to be sufficient for purposes of identifying trade secrets in blueprints and engineering drawings. *See also Imax*, 152 F.3d at 1167. Thereafter, in *Imax Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1164-67 (9th Cir. 1998), Imax claimed trade secrets in "dimensions and tolerances" pertaining to its projector, and the Ninth Circuit affirmed the lower court's grant of summary judgment in favor of the defendant on the basis that Imax had failed to sufficiently identify which precise numerical dimensions and tolerances it claimed to be its trade secrets.

Of note, the *Imax* court confined its holding to the facts before it and *Forro* remains good law. *See Imax,* 152 F.3d at 1166-67 (distinguishing the facts of *Imax* from the facts of *Forro*). As

the Ninth Circuit explained, the "dimensions and tolerances" in *Forro* were sufficient because they had clearly referred to trade secret material – i.e. engineering drawings and blueprints – whereas the "dimensions and tolerances" in *Imax* referred only to a patented projector system, as to which the eligibility for trade secret protection was unclear. *See id.* at 1167. Further, it was important to the *Imax* court that the defendant in the case was an outside, unrelated competitor who would have needed concrete information from Imax in order to defend against the claim. *Id.*

In an unpublished opinion decided after *Imax*, the Ninth Circuit, quoting *Imax*, found that summary judgment on a misappropriation of trade secrets claim in software had been inappropriate in part because the plaintiff had identified key functional components of the software in which it was claiming a trade secret. *See U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 494 F. App'x 743, 744 (9th Cir. 2012).

Similarly, in another unpublished opinion decided after *Imax*, the Ninth Circuit reversed a lower court's grant of summary judgment on a trade secret claim based on the defendant's alleged misappropriation of source code, in part because the court found that the plaintiff had sufficiently identified the specific key aspects of its source code that it claimed the defendant, who was the plaintiff's former chief technology officer and who had access to the source code, had misappropriated. *See Integral Development Corp. v. Tolat*, 675 Fed. App'x 700, 703 (9th Cir. 2017).

In the present case, as set forth in the Crowes' Amended Disclosure Statement, "Crowe is a control engineer in the business of designing, installing, and fine-tuning control systems for turbine engines used for aviation, and other industrial applications, including oil and gas production by hydraulic fracturing." (Admin. Dkt. 134 at 7). Further, there is no dispute that, while at TES, Crowe was one of the software engineers who traveled to Louisiana to work on the control systems for the respective engines in connection with the adaptation of the iDEC to power hydraulic fracturing and pumping equipment applications. In that regard he presumably would have had access to the interface information, or "interface chunks," which were embedded in the iDEC control's source code. The Crom Testimony indicates that these interface chunks comprise a discrete 2-4% of the source code that was developed by TES and TPT, without which

the engines would not operate as intended.

Additionally, based upon Crowe's deposition testimony and the information provided in the Amended Disclosure Statement, Crowe has indicated that he knows what TPT's alleged trade secrets are. Accordingly, it appears to the Court that Crowe has sufficient information and knowledge to defend against TPT's claims.

Further, unlike in *Imax,* in which the court noted that it appeared unlikely a trier of fact would have the expertise to be able to discern which of the many dimensions and tolerances in the Imax projector system Imax alleged were its trade secrets, in this case, TPT has submitted the Expert Report, which it asserts specifically refers to the source code, identifies the interface information, or "chunks," at issue, explains what they mean, how they are used, and why they are protectable as trade secrets.[11]

Lastly, contrary to the Crowes' position that TPT is required to present a definition of its trade secret(s) that is distinct from that presented to the court in the TES v. TPT Litigation, no party has cited the Court to any final order in the TES v. TPT Litigation, or to any final order in any of the other pre-petition litigation discussed above, that is both material with respect to this ruling and entitled to preclusive effect in this case.

**IV.     Conclusion**

Based upon the foregoing, and the record reviewed by the Court, the Court finds and concludes that TPT has provided sufficient detail regarding its alleged trade secret(s) to discern what might be legally protectable – specifically, interface information, including operating and protective parameters, embedded into, and comprising 2-4% of, the iDEC control's source code, developed in connection with the adaptation of the iDEC to power hydraulic fracturing and pumping equipment applications. In short, TPT has identified the key aspects and functional components of specific software in which it is claiming trade secret(s), and as such, TPT has described what it asserts are its trade secret(s) with sufficient particularity to overcome the MPSJ.

This ruling does not make any determination as to any other issue necessary to establish

---

[11] Given that TPT's motion to file the Expert Report under seal remains pending, the Expert Report is not part of the record at this time.

a trade secret, misappropriation of a trade secret, or a non-dischargeable obligation under 11 U.S.C. § 523.

Wherefore, based upon the foregoing and for good cause shown;

**IT IS HEREBY ORDERED** that the *Motion for Partial Summary Judgment (Counts I-III) (Dkt. 19)* is denied.

**DATED AND SIGNED ABOVE.**

Case 4:19-ap-00260-BMW    Doc 132    Filed 07/31/20    Entered 07/31/20 14:24:37    Desc
Main Document    Page 19 of 19

19